UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL A. BUTCH,

           Plaintiff,                   Case No. 05-73352

vs.

                                HONORABLE NANCY G. EDMUNDS

JO ANNE B. BARNHART,             MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

           Defendant.

                          /

## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Paul Butch brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI. Both parties have filed motions for summary judgment, which have been referred to the undersigned pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED and Defendant's motion for summary judgment be DENIED.

### A.    Procedural History

Plaintiff was born on April 21, 1980, and applied for DIB on March 5, 2003, alleging that he had became disabled on January 26, 2003, due to "Don't know Speech Impairment EMI" and "Don't know Hereditary Spherocytosis" (R. 48, 56).[1] Plaintiff applied for SSI on January 31,

---

[1]Plaintiff did not indicate what the term "EMI" meant, but it likely stands for Educable Mentally Impaired, which was the special education designation given to him in school (R. 230, 239, 243).

2003, alleging that he had become disabled on June 1, 1998 (R.287). He later amended his alleged onset date to January 23, 2003 (R. 51). In the Proposed Findings submitted to Administrative Law Judge (ALJ) Daniel Berk, counsel for Plaintiff also alleges Plaintiff suffers from mental retardation, low IQ scores ranging from 59 to 70, depression, poor motor skills, and personality disorder, mixed, with schizoid features (R. 44-46). After Plaintiff's application was initially denied, he had a April 5, 2005, hearing before ALJ Berk who issued a decision on June 14, 2005, finding Plaintiff not disabled on August 12, 2005 (R. 9-20). The Appeals Council denied Plaintiff's request for review (R. 5-7).

### B.   Background Facts

#### 1.   Plaintiff's Testimony

In his *Disability Report* Plaintiff indicated he could speak and read English, but was unable to write more than his name in English (R. 55). Plaintiff claimed that his illnesses or conditions do cause him pain or other symptoms and that he has had to "miss work once in a while due to my illness, Hereditary Spherocytosis" (R. 56).

Plaintiff's mother filled out his *Daily Activity Sheet* and stated that he likes to go bowling, browse the Internet looking at trucks for sale, collects model cars and trucks and play video games, but his mother is "not sure how good he is" (R. 76, 79). Plaintiff has two friends with whom he does limited activities, such as talking on the phone, bowling, or watching television (R. 77, 79).

Although Plaintiff drives weekly, he does get lost if he is not paying attention and has been in two accidents in seven months (R. 78). Plaintiff is able to do weekly household chores like emptying the dishwasher, cleaning his bedroom, washing his clothes and monthly yard work. Yet, he "has to be told to do it" and needs help when fixing things. He is capable of

2

grooming and bathing himself, but his mother states "I have to get on him about showering, brushing teeth, washing up daily" (R. 78, 81). Also, Plaintiff only goes shopping, to dinner or to the movies and visits relatives when he is with his mother and sister (R. 78-79). He is unable to pay bills or handle his own finances (R. 79).

Plaintiff is very shy, quiet, hard to understand and speaks in a low voice (R. 77).[2] He talks to neighbors "only if they talk to him" and must repeat things when talking to his friends on the phone (R. 79).

Plaintiff was apparently fired on January 23, 2003, from his employment at Burger King (R. 56).[3] Before that he worked at Arby's, as a crew member, and Kroger, as a grocery bagger, and was fired from both positions. He admits that he was fired from Kroger for taking a candy bar without paying. He was fired from Arby's because they suspected he had taken money from the cash drawer, which he denies (R. 306-307). In Plaintiff's *Work Activity Report* he stated he started employment with Freedom Work Opportunities on February 11, 2003, to work at the Food Bank in Fenton, Michigan, but only worked two days for five-and-a-half hours per day (R. 66). Plaintiff later worked at Hines Park Ford for about four months in 2004 as a porter and was fired for backing into a gate (R. 303, 305-306). Plaintiff's last employment was at Wal-Mart retrieving carts from approximately July 2004 to January 1, 2005, which he quit because, "they

---

[2] The ALJ had difficulty understanding Plaintiff during the hearing and frequently asked him to repeat himself or relied on Plaintiff's attorney to tell him what Plaintiff was saying (R. 302-303, 305-307).

[3] At the hearing Plaintiff had a hard time recalling dates and remembering the chronological order of his past employment (R. 302-305). Plaintiff testified he worked at Kroger as a bagger and cart retriever for approximately one year in 2002 (R. 304). When asked if he worked any place prior to Kroger he stated he worked at Arby's for six months in 2003 as a cashier and crew worker. When ALJ Berk stated "that sounds like it was after Kroger's," Plaintiff responded, "well, '04" and later stated his employment at Kroger was before Arby's.

3

were giving me a hard time . . . getting more carts and weren't nice to me" (R. 302, 305).  When Plaintiff filed his Request for Hearing, he stated he started working at McDonalds in May 2003 for 12 to 20 hours per week.  His earnings record shows seven years of low wages ranging from $2,000 to $11,000 (R. 53).

At his hearing, when Plaintiff was asked if he had any difficulty with past employers because of his communication problem, Plaintiff responded "some", which he explained was "not doing the job right" (R. 307).  When ALJ Berk explained that this did not answer the question and asked if the communication problems due to speech "proved to be a factor" in his previous employment, Plaintiff stated, "No" (R. 307-308).

### 2.   *Medical Evidence*

#### a.   **Evidence of Physical Impairments**

Because Plaintiff's claims relate primarily to non-exertional impairments the medical evidence of physical impairments is not considered relevant, but is set out in Appendix A to this Report in case the reviewing judge determines otherwise.

#### b.   **Evidence of Mental Impairments**

On March 26-27, 1985, Plaintiff received a Psychological Evaluation by Huron Valley Schools psychologist to determine proper placement due to concern about his level of progress (R. 174).  Notes indicated Plaintiff had been in the PAL Pre-Primary special education program for two years and had "made a lot of progress since the beginning of the program," but "continues to be small for his age and generally developmentally delayed".  The report indicated Plaintiff was easily distracted during testing and when the examiner pointed to a picture, he "seemed to just look at the examiner's finger" and on face recognition would get "side tracked on details exclaiming 'Her got teeth' or 'Her got hair" . . . rather than the task of identifying the

4

person".

On May 20-21, 1986, Plaintiff received a Psychological Evaluation by Huron Valley Schools psychologist again to "help determine his program for the next year" (R. 171). The examiner noted that Plaintiff remained non-verbal whenever possible throughout testing or would provide single word answers. He "had to be coaxed or encouraged to respond to the verbal items," and had "difficulty expressing himself verbally" (R. 171-172). He had difficulty performing more than one or two step requests at a time and needed directions broken down into steps (R. 171). Plaintiff appeared to be "developmentally delayed and possibly much slower than average in his aptitude for school work" (R. 173).

On September 22, 1994, Plaintiff received another Psychological Evaluation by Huron Valley Schools psychologist to reevaluate him for special education eligibility because he would be beginning high school the next year (R. 208). The report noted that Plaintiff's teacher found that he "often does not know how to react with peers in mainstream situations" and "continues to have difficulty with articulation and often cannot make himself understood". Plaintiff scored a Verbal IQ of 71, Performance IQ of 64 and Full Scale IQ of 65 (R. 210). Plaintiff's "overall IQ score continue[d] to fall within the educable mentally impaired range and at the 1 percentile rank of the population" and the examiner noted that "with an obtained score of 65, a confidence interval of 61-72 is assumed".

On December 4, 1997, Plaintiff, in the eleventh grade at the time, received another Psychological Evaluation by Huron Valley Schools psychologist (R. 213). The report noted that Plaintiff had been previously dual-certified as both Speech and Language and Educable Mentally Impaired and placed in a self-contained EMI classroom. Medically Plaintiff was described as "a failure to thrive baby" and consistently reached developmental milestones at a delayed age, such

5

as not talking until 24 months and toilet training after three years of age (R. 214). Plaintiff scored a Verbal IQ of 76, Performance IQ of 68 and Full Scale IQ of 70. This placed him within the borderline to mildly mentally impaired range and ranking in the 2nd percentile among his peers (R. 215).

A May 11, 1998, evaluation from a teacher reported he "definitely needs a helping hand to guide him," misses assignments, turns in late or incomplete work, fails tests, has poor listening comprehension and has difficulty following directions (R. 222). On May 12, 1998, a special education staff member also completed the Specific Learning Disability Learning Opportunities Checklist, which found that Plaintiff's learning disabilities persisted despite numerous factors including private tutoring, remedial assistance and regular attendance (R. 224). On May 18, 1998, Plaintiff received a Multidisciplinary Evaluation Team Report for the Speech and Language Impaired which noted his speech impairment interfered with development or adversely affected his educational performance and determined him eligible to be certified as Speech and Language impaired (R. 219). An evaluation by Plaintiff's teacher noted that he:

- does not speak in complete sentences;
- does not express himself effectively;
- does not communicate with peers effectively;
- does not respond appropriately to questions used in "everyday" language;
- is unable to establish and maintain eye contact;
- is unable to initiate and maintain appropriate conversation;
- and that these behaviors interfere with his performance.

(R. 220).

A final evaluation was completed by the Huron Valley Schools Special Education Services on May 20, 1999, prior to Plaintiff graduating from high school. It noted he was "functioning below grade level in all academic areas" and "doesn't advocate for himself and often chooses not to communicate with others" (R. 225-226). A Transitions Life Plan completed

6

with Plaintiff's special education teacher reported goals for Plaintiff to seek full-time employment and get assistance for the job/skill search from the Michigan Jobs Commission (R. 236).

A July 9, 2001, psychological evaluation by Dr. Thomas Rosenbaum concluded that Plaintiff functioned in the "Mildly Mentally Retarded range of intellectual functioning", but despite his lower level of intelligence he could read individual words and spell at a post high school level" (R. 106). His math skills were at an elementary level and he was socially timid and shy. His scores suggested mild depression, though he had never engaged in counseling. His speech was difficult to understand "despite the speech therapy that he reportedly received". His spherocytosis could not explain his learning difficulties, but the associated "weakness and pallor may have contributed to his withdrawn and depressed demeanor".

The Wechsler Adult Intelligence Scale found Plaintiff had a verbal IQ of 77, performance IQ of 65, with a Full Scale IQ of 69, placing him the in the Mildly Mentally Retarded range of intellectual functioning (R. 104). While the Wide Range Achievement Test showed Plaintiff had a Reading and Spelling equivalent of post high school, his Arithmetic score was in the 3rd percentile with a fourth grade equivalent (R. 105). Also, the Bender-Gestalt test showed that Plaintiff may suffer from a neurological impairment affecting his graphomotor skills and feelings of insecurity, inferiority and low self-esteem (R. 105-106). Plaintiff also reported experiencing auditory hallucinations when he was with others (R. 106). Dr. Rosenbaum noted that Plaintiff had a flat affect through examination, made little eye contact, and preferred to point to answer rather than verbalize, which "may have been due to an underlying discomfort related to his speech impediment" (R. 106). Dr. Rosenbaum recommended speech therapy; counseling for depression, social discomfort, anxiety and auditory hallucinations; a Career Assessment

7

along with training and "in job tryouts . . . . to better assess his interests in alternative[4] areas of employment," and opined that Plaintiff might benefit from participation in the Michigan Career and Technical Institute (R. 106-107). The final prognosis was "fair, if the client participates in recommended counseling and follow up recommendations." Dr. Rosenbaum felt that Plaintiff could "secure competitive employment" and did not have "documented work restrictions that limit his activities". He diagnosed Plaintiff with Adjustment Disorder, Depression; Borderline Intellectual Functioning; and Personality Disorder, mixed, with schizoid features (R. 107).

On August 18, 2001, Plaintiff received an Assessment Update from the Oakland Psychological Clinic to be evaluated for admission for depressed mood, depressed energy and work problems (R. 2 45).[5] Plaintiff was found to have a flat affect, depressed mood, low intelligence with impaired abstraction, judgement and insight (R. 246). He was mildly retarded and depressed about being fired from his job. He was admitted for individual treatment once a week for approximately 10 visits (R. 247-249).

He was discharged on December 1, 2001 (R. 244). It was determined that Plaintiff was able to relieve anxiety and resume his job. Plaintiff was discharged for successful completion of treatment with "improved" condition.

A May 13, 2003, Psychiatric Review Technique form was completed by a DDS physician, Dr. Joseph, M.D., who found that Plaintiff suffered from Adjustment Disorder – Depressed (R. 85-88), Personality Disorder Mixed with Schziod Features (R. 97), Borderline

---

[4] Plaintiff expressed interest in becoming a truck driver, but he failed the road test three times (R. 104).

[5] Exam notes indicated that Plaintiff had seen a therapist "a few years ago - 1996....having anxiety and depression daily and low self-esteem," but there are no records of these visits (R. 245).

Intellectual Functioning (R. 89). Dr. Joseph found on the "B" Criteria that Plaintiff had mild limitations on his activities of daily living and moderate limitations in maintaining social functioning, concentration, persistence and pace (R. 95). There was no reviewer evidence of the "C" Criteria (R. 96). A Mental Residual Functional Capacity Assessment was also completed by Dr. Joseph in which it was determined that Plaintiff was moderately limited in his ability to:

- understand and remember detailed instructions;
- carry out detailed instructions;
- maintain attention and concentration for extended periods;
- complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- respond appropriately to changes in the work setting and
- set realistic goals or make plans independently of others.

(R. 99-100). He felt that Plaintiff could perform full-time jobs requiring minimal communication competency and he could sustain sufficient concentration, persistence and pace to perform simple repetitive tasks on a regular and continuous basis" (R. 101).

### c. Appeals Council Evidence

On appeal, the Plaintiff attached a April 13, 2005, letter from George Burnett, a Rehabilitation Counselor with the State of Michigan Department of Labor Rehabilitation Services (R. 296-297).[6] The letter informed Plaintiff that his case was closed with Michigan Rehabilitation Services "since you are not able to maintain satisfactory employment" and "attempted to maintain several jobs without success" (R. 297). Mr. Burnett also noted that "it would be unlikely you could support yourself independently through competitive work".

---

[6]Plaintiff's counsel alleged in a July 1, 2005, letter to the Appeals Council that the Burnett letter was submitted to the Office of Hearings and Appeals on April 15, 2005 (R. 296). Plaintiff's counsel also claimed that this report was requested by the ALJ, however there is no record of this in the hearing transcript, and the letter is dated 8 days after the April 5, 2005, hearing date. (R. 296).

9

### 3.    *Vocational Evidence*

The Vocational Expert Dr. Asa Brown testified at Plaintiff's administrative hearing on April 5, 2005. ALJ Berk asked VE Brown to review Plaintiff's past relevant work and define the exertional and skill levels (R. 310). VE Brown testified that all the jobs were unskilled, that the job at Arby's was light exertional, and the jobs at Wal-Mart, Hines Park Ford and Kroger were medium exertional, but that none of the jobs provided any transferable skills.

ALJ Berk then asked VE Brown whether a hypothetical person of Plaintiff's age, education, work experience and communication problems would be precluded from substantial gainful activity at any exertional level. VE Brown responded that the person would be precluded from jobs that are highly dependent on social intercourse of one kind or another, and regardless of Plaintiff's testimony of whether it affected losing his jobs, it would clearly preclude "sales work and that kind of thing" (R. 310-311). ALJ Berk then asked if such a person would be precluded from the work Plaintiff described as his past work. VE Brown responded that it would preclude crew member work at Arby's due to the public contact, but that it would not preclude "the others" (R. 311).

Upon questioning by his counsel, Plaintiff then testified that his speech difficulty has been pretty much the same his whole life, he was nineteen when he graduated high school, it took him five years to get his driver's license and he has been driving for four years and has been in two accidents. Plaintiff then went on to describe his past work of bagging, cart retrieval and mopping at Kroger (R. 312-313).

ALJ Berk then resumed questioning VE Brown, asking how many jobs existed within the

10

region of the jobs identified that Plaintiff could perform (R. 313-314).[7] VE Brown responded that in the seven surrounding counties, if the jobs involving interpersonal contact were removed, "about 3,500 out of an aggregate of almost 8,000" would be left, and "just over 6,000" statewide (R. 314).

Plaintiff's counsel then asked VE Brown on which of Plaintiff's specific impairments or factors his opinion that Plaintiff could perform some of his past work was based. VE Brown responded that, as the question had been presented, he had based the opinion on the information brought forward at the hearing and that all of the jobs, except Arby's, would be a possibility. Plaintiff's counsel then asked VE Brown how mental retardation, an IQ of between 60 and 70, would affect the availability of jobs (R. 314-315). VE Brown testified ". . . that single fact . . . would limit a person to unskilled work" (R. 315) (all of Plaintiff's past work was unskilled).

Next Plaintiff's counsel asked how "some personality disorders" would affect the availability of jobs. VE Brown responded that "it could be a more powerful factor from a vocational standpoint than intelligence scores," but asked to what personality disorders he was referring. Plaintiff's counsel referred to the diagnoses of schizotypic personality disorder. VE Brown then stated, "It's sort of way far away from where I ought to be in terms of testifying". Plaintiff's counsel then asked VE Brown to consider plaintiff's speech impediment and VE Brown said he had already excluded jobs dependent on social communication with customers.

Plaintiff's counsel next inquired whether poor motor skills would affect the jobs to which he referred and VE Brown agreed that it would, but did not give any detail as to how. In response

---

[7]VE Brown does state earlier that any jobs highly dependent on social intercourse, sales-type work and crew member work at Arby's would be precluded (R. 310-311). As to those jobs identified as ones Plaintiff could perform, VE Brown only testified "The others it wouldn't," presumably referring to the past employment Plaintiff described at Wal-Mart, Hines Park Ford and Kroger.

11

to Plaintiff's counsel remark that Plaintiff had hereditary spherocytosis, VE Brown asked and claimant indicated that it did not cause frequent periods of jaundice or anemia (R. 315-316). VE Brown responded "okay" to this testimony (R. 316). VE Brown also agreed that lack of energy would be a factor, but did not indicate how these added factors would specifically affect the jobs identified that Plaintiff could perform.

### 4. The ALJ's Decision

ALJ Berk found that Plaintiff met the non-disability requirements and was insured for benefits through the date of his decision (R. 19).

Plaintiff had "borderline intellectual functioning, moderate dysarthria, mild to moderate dysphoria, a history of an adjustment disorder and hereditary sperocytosis" but these impairments did not meet or equal on of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

Plaintiff's testimony was credible in "to the extent he acknowledged the ability to perform as a bagger". Plaintiff had the RFC for simple, unskilled work that is not highly dependant upon social intercourse, and Plaintiff's past relevant work as a bagger did not require the performance of work-related activities that would be precluded by this RFC. Therefore, Plaintiff was not under a disability.

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[8]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

ALJ Berk found that Plaintiff did not meet the Listing of Impairments. He found that after the June - December 2001 exacerbation of Plaintiff's depression and anxiety, there was no further episodes and thus his "adjustment Disorder Depressed" did not meet listing 12.04 Affective Disorder" (R.14 & 17 , R. 88). Plaintiff does not challenge this.

ALJ Berk found Plaintiff did not meet Listing 12.05 Mental Retardation because he did not find "credible" (i.e. valid) any IQ scores showing an IQ of 60-70 (R. 15-16). This finding is

---

[8] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

challenged. Plaintiff argues that the evidence supports a finding that Plaintiff's impairments meet

Listings 12.05 B, C and D.

Finally, ALJ Beck found that Plaintiff did not meet his burden of demonstrating disability

because Plaintiff could perform his former work as a grocery bagger (R. 19). Plaintiff argues that

this finding is not supported by substantial evidence.

### 1.    *Listing 12.05*

The introduction to the mental impairment listings, including Listing 12.05, explains,

> The structure of the listing for mental retardation (12.05) is different from that of
> the other mental disorders listings. Listing 12.05 contains an introductory
> paragraph with the diagnostic description for mental retardation. It also contains
> four sets of criteria (paragraphs A through D). *If your impairment satisfies the
> diagnostic description in the introductory paragraph and any one of the four sets
> of criteria*, we will find that your impairment meets the listing. Paragraphs A and
> B contain criteria that describe disorders we consider severe enough to prevent
> your doing any gainful activity without any additional assessment of functional
> limitations. For paragraph C, we will assess the degree of functional limitation the
> additional impairment(s) imposes to determine if it significantly limits your
> physical or mental ability to do basic work activities, i.e., is a "severe"
> impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional
> impairment(s) does not cause limitations that are "severe" as defined in §§
> 404.1520(c) and 416.920(c), we will not find that the additional impairment(s)
> imposes "an additional and significant work-related limitation of function," even if
> you are unable to do your past work because of the unique features of that work.
> Paragraph D contains the same functional criteria that are required under
> paragraph B of the other mental disorders listings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) (emphasis supplied).

The relevant portions of Listing 12.05 follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
> ****
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> Or

14

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
or other mental impairment imposing an additional and significant work-related
limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at
least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

### a. 12.00(A) Mental Disorders

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) MENTAL DISORDERS notes:

We will find that you have a listed impairment if the diagnostic description in the
introductory paragraph and the criteria of both paragraphs A and B (or A and C,
when appropriate) if the listed impairment are satisfied.

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) cites this provision in noting that a "claimant

must demonstrate that her impairment satisfies the diagnostic description for the listed

impairment in order to be found disabled thereunder". Here that requires finding:

Mental retardation refers to significantly subaverage general intellectual
functioning with deficits in adaptive functioning initially manifested during the
developmental period; i.e., the evidence demonstrates or supports onset of the
impairment before age 22.

Listing 12.05.

*Foster* found insufficient proof of mental retardation prior to age 22. Here if the IQ

scores are considered valid, Plaintiff suffered from mental retardation prior to his 22nd birthday

on April 21, 2002. Yet, the ALJ does not credit these scores for reasons noted below. No

evaluator classified Plaintiff as suffering from "mental retardation." In his early school years he

was classified as "Educable Mentally Impaired" (R. 210 & 213), or "borderline to mildly

mentally impaired" (R. 215). While Dr. Rosenbaum acknowledged that Plaintiff's IQ scores

placed him in the "Mildly Mentally Retarded range of intellectual functioning" range and subtest

scores fell within the borderline to deficient range, he noted his ability to read and spell at a "Post High School" level (R. 104-05). He classified Plaintiff as "Borderline Intellectual Functioning", not mentally retarded (R. 107). He also gave him a "fair" overall evaluation and, with counseling and follow up, he thought Plaintiff could "secure competitive employment." Finally, Dr. Joseph also classified Plaintiff as "Borderline Intellectual Functioning" (R.89).

Plaintiff's claimed disability onset in January 2003 is also after his 22 birthday (R. 48 and R. 51), which does not support disabling mental retardation before age 22. Thus one could say that Plaintiff does not meet the "diagnostic description in the introductory paragraph " of 12:05, and no further analysis under subparagraphs A-D is required.

*Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006), however, notes that "this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retardation . . . ."

Assuming the Sixth Circuit would agree with the Eighth Circuit, the analysis of Plaintiff's argument will continue.

### b. 12.05(B)

Plaintiff first argues that he meets Listing 12.05(B) because his IQ was tested at 59 on April 25, 1991, when he was 11 years old. ALJ Berk discounted this test because it was a childhood IQ test, too remote and not consistent with Plaintiff's other childhood and/or adult IQ tests (69 in 1988, 65 in 1994, 70 in 1997 and 69 in 2001) (R. 15). ALJ Berk relied instead on the most recent tests administered by Dr. Thomas C. Rosenbaum on June 28, 2001 (R. 14). Dr. Rosenbaum administered an adult IQ test (Wechsler Intelligent Scale-III), which yielded a full-scale score of 69, together with the Wide Range Achievements Test-Revision III, which indicated that Plaintiff was reading and spelling at a post-high school level but performing

16

arithmetic at a fourth grade level – the final diagnosis was adjustment disorder, depression; borderline intellectual functioning; and personality disorder, mixed with schizoid features (R. 107).

Plaintiff does not contest the validity of Dr. Rosenbaum's findings or the 2001 IQ test, but argues that a claimant's lowest IQ test score must be used in determining intelligence. The cases Plaintiff cites in support of this proposition are not directly on-point. In *Cockerham v. Sullivan*, 895 F.2d 492, 496 (8th Cir. 1990), the Court noted the requirement contained in 12.00D 6 c : "When more than one I.Q. score is derived *from a given test*, the lowest of the I.Q. scores is used in applying the Social Security regulations. *Webber v. Secretary of Health & Human Servs.*, 784 F.2d 293, 298 n. 6 (8th Cir.1986)." *Id.* (emphasis supplied). And, while the other case cited by Plaintiff, *Ray v. Charter* 934 F. Supp 347 (N.D. Cal. 1996), extends this requirement to "infer[] that when multiple I.Q. scores are available the Regulations prefer[s] the lowest score", the *Ray* Court had before it 2 tests that measured the claimant's IQ within 2 years of each other and the earlier test had been performed within 3 years of the Court's opinion. *Id.* at 348. It also is reading more into the language of 12.00(D) than would many courts. That language is:

> In cases where more than one IQ is customarily derived from the test administration, .e.g., where verbal, performance and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

In the present case Plaintiff asks the court to consider a childhood IQ test taken 14 years before the ALJ's hearing in lieu of an adult IQ test taken 4 years before the hearing, without disputing th e validity of the later test. Even if the *Ray* Court's expansive reading of the Regulations' requirement is correct and it is generally preferable to use the lower of two IQ test

17

scores, in the present case where there are three subsequent IQ tests with results above 59 –

1994 - V 71. P 64, FS 65 (R. 205), 1997 - V 76. P 68, FS 70 (R. 214) 2001 - V 77. P 65, FS 69

(R. 104. In such a case, an ALJ can reject the lower and older score in deference to three

relatively consistent higher test results.

Therefore, there is substantial evidence in the record supporting ALJ Berk's decision to

discount the 1991 childhood IQ test result under the current circumstances and deny Plaintiff's

argument that he met Listing 12.05(B).

### b.  Listing 12.05(C).

Listing 12.05(C) requires a valid IQ test result between 60-70 and "a physical or other

mental impairment imposing an additional and significant work-related limitation of function".

Plaintiff argues that he meets Listing 12.05(C) because his IQ test scores are all 70 or below and

"he has physical and mental impairments that impose additional and significant work-related

limitation of function, to wit: a significant speech impairment . . . poor motor skills, schizotypal

personality [and] spherocytosis" (Dkt. # 7, p. 6).

The existence of these facts, even if taken as true, does not in itself dictate a finding of

disability under Listing 12.05(C). The introductory paragraph of Listing 12.05 must also be met,

and states: "mental retardation refers to significantly subaverage general intellectual functioning

with deficits in adaptive functioning initially manifested during the developmental period; i.e.,

the evidence demonstrates or supports onset of the impairment before age 22". Therefore, as

stated earlier, Listing 12.05 is met only if ones "impairment satisfies the diagnostic description

in the introductory paragraph and any one of the four sets of criteria". 20 C.F.R. Pt. 404, Subpt.

P, App. 1, 12.00(A); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must

demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder".).

Even *Maresh* noted that:

to meet Listing 12.05C, a claimant must show: (1) **a valid verbal, performance, or full scale IQ of 60 through 70**; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.

438 F.3d at 899 (emphasis supplied.).

Clearly, if Plaintiff has "a valid verbal, performance, or full scale IQ of 60 through 70" before April 4, 2002, he meets Listing 12:05(C) at step three of the sequential evaluation and is entitled to an award of benefits. If disabled at step three, the Commissioner does not proceed to step four or five. Plaintiff's speech problem is clearly a "physical or other mental impairment imposing an additional and significant work-related limitation of function." [9]

---

[9] 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 notes that:

For paragraph C, [referring to 12:05C ]we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s), as defined in §§404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

Thus we apply the *Farris v. Secretary*, 773 F.2d 85, 89-90 (6th Cir. 1985) standard,

an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience."

Butch's language problems would meet this definition of "severe", and thus be considered "an additional and significant work-related limitation of function. VE Brown testified that a person of Plaintiff's age, education, work experience and communication problems would be precluded from jobs that are highly dependent on social intercourse of one

19

Yet, ALJ Berk found that he did not have a credible IQ score showing an IQ in the 60-70

range (R. 15-16). ALJ Berk found Plaintiff's latest performance IQ score of 65 and full-scale

score of 69, as administered by Dr. Rosenbaum, not to be credible for the following reasons:

> (a.) **Dr. Rosenbaum's Report.** Dr. Rosenbaum diagnosed Plaintiff with   borderline
> intellectual functioning despite the fact that the IQ score alone would indicate mild
> mental retardation; Dr. Rosenbaum noted Plaintiff's post highschool reading and
> spelling; Dr. Rosenbaum noted Plaintiff's compensatory skills to achieve at levels
> superior to his educational background and concluded he could perform at a level above
> his IQ scores;
>
> (b.) **Plaintiff's daily activities** and social functional abilities were inconsistent with this
> low IQ score; and
>
> (c.) Plaintiff had a **history of gainful employment** and was literate (R. 15-16).

It is assumed that these were the reasons ALJ Berk also rejected as not credible the other

IQ tests showing scores below 70.

Plaintiff's counsel does not address the credibility or validity of Plaintiff's IQ scores in

light of the diagnosis of borderline intellectual functioning and, as stated above, simply argues

that because his IQ test score was below 70 and he has qualifying physical and mental

impairments he meets Listing 12.05(C) (Dkt. # 7, p. 6).

Yet, the results of an IQ test are rebuttable and the Commissioner is not required to

accept a claimant's IQ scores and may reject scores that are inconsistent with the record.. *Markle*

*v. Barnhart,* 324 F.3d 182, 186 (3rd Cir. 2003) *Clark v. Apfel,* 141 F.3d 1253, 1255 (8th

---

kind or another, and  it would clearly preclude "sales work and that kind of thing" (R. 310-311).
Thus, while not work preclusive, this speech problem is not a "slight abnormality which has such
a minimal effect." and meets the *Farris* standard of severe.

20

Cir.1998) and *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir.1986). While the Sixth Circuit in *Brown v. Sec'y of HHS,* 948 F.2d 268, 270 (6th Cir.1991) rejected the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education and ability to make change, do laundry and clean his room, that case is distinguishable. Here, ALJ Beck has significantly more evidence than in *Brown* – Plaintiff was never diagnosed as mentally retarded, he has test scores at post high school level, he is literate, his daily activities include computer usage and surfing the internet which are inconsistent with his IQ scores, and he has a seven year work history.[10]

Here ALJ Berk has provided sufficient justifications for finding the IQ scores invalid and Plaintiff's counsel has provided this Court with no argument to the contrary. Thus, if there are no valid IQ test results in the 60-70 range, there is substantial evidence to uphold ALJ Berk's finding that Plaintiff does not meet Listing 12.05(C).

### c.  Listing 12.05(D)

Plaintiff's argument that he meets Listing 12.05(D) is similar to that put forth in support of Listing 12.05(C). Plaintiff simply states that he has IQ test results under 70 and states that

---

[10] *But see* Judge Richard Posner's opinion in *Henderson v. Barnhart,* 349 F.3d 434 (7th Cir. 2003) notes that past work does not necessarily preclude a claimant from meeting the Listing of 12.05 for Mental Retardation at Step 2.

> . . . the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation. E.g., *Hawkins v. First Union Corporation Long-Term Disability Plan,* 326 F.3d 914, 918 (7th Cir.2003); *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan,* 195 F.3d 975, 983 (7th Cir.1999); *Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir.1998); *Jones v. Shalala,* 21 F.3d 191, 192-93 (7th Cir.1994); *Kelley v. Callahan,* 133 F.3d 583, 588 (8th Cir.1998).

*Id.* at 435-36.

"records submitted demonstrate 'marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence and pace, or repeated episodes of decompensation, each of extended duration'".[11]  Yet Plaintiff does not cite where one could find such evidence in the record[12] and does not refute Dr. Joseph's finding that Plaintiff was moderately and not markedly limited in these areas.  Therefore, Plaintiff's argument that he meets Listing 12.05(D) should be denied.

### 2.    Plaintiff's Past Work

Plaintiff argues that ALJ Berk erred in determining that he had the residual functional capacity to return to his past work as a grocery bagger.  In fact, Plaintiff disputes that the record contains support for this contention despite the fact it was Plaintiff who offered this occupation in response to ALJ Berk's question about whether there was any work which he felt he could do (R. 307).

Plaintiff's counsel also argues that Plaintiff cannot give intelligent answers and, therefore, his response should be given little weight.  Yet, the undisputed record shows that Plaintiff worked as a grocery bagger for Kroger for an extended period of time[13] and only ceased this job when he was fired for taking a candy bar, not for inadequate performance (R. 57, 56,

---

[11] Also the arguments in the above section that there is substantial evidence to uphold ALJ Beck's rejection of IQ test scores between 60 and 70 would also defeat a claim under Listing 12:05(D).

[12] The only specific findings in the record with respect to Plaintiff's social functioning and concentration, persistence and pace; etc. showed "moderate" and not "marked" difficulties (R. 95).

[13] Plaintiff indicated that he worked there for "3 years" but then gave the dates worked as September 2000-June 2001 and October 2001-October 2002 (R. 57) and he stated at the hearing that he worked there for 1 year (R. 304).

306). Further, ALJ Berk asked VE Brown if the hypothetical worker would be precluded from the work Plaintiff described as his past work, and VE Brown responded that it would preclude crew member work at Arby's due to the public contact, but that it would not preclude "the others" (R. 311). This would include his bagger job. Thus, there is substantial evidence in the record to uphold ALJ Berk's finding at step four that Plaintiff can perform his past work as a grocery bagger.

### III.   RECOMMENDATION

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections by September 21, 2006, as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 1, 2006                          s/Steven D. Pepe
Ann Arbor, Michigan                               United States Magistrate Judge

<u>Certificate of Service</u>

     I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on September 1, 2006.

s/Deadrea Eldridge
Courtroom Deputy Clerk

**APPENDIX A**

**Summary of Facts Regarding Plaintiff's Physical Impairments**

The medical record includes exams dating as far back as November 22, 1980, for a fever Plaintiff had at seven months old. (R. 177). These reports include largely illegible hand-written doctors reports from November 22, 1980, to February 12, 1985, for doctor's appointments for fever, vaccinations and foot x-rays that do not appear relevant to the Plaintiff's current disability claims (R. 177-189).

A February 28, 1992, blood test report showed Plaintiff's hemoglobin level at 12.3, with a normal hemoglobin range between approximately 13 - 18. (R. 192).

A March 18, 1992, echogram of the abdomen found Plaintiff suffered from cholelithiasis[1] without biliary dilatation and a slightly enlarged spleen. (R. 194).

A July 13, 1993, letter from Professor Robert M. Johnson at Wayne State University School of Medicine confirms Plaintiff's diagnosis of hereditary spherocytosis,[2] after conducting rheological examinations on both Plaintiff and his mother (R. 145). Notes indicated that the condition is hereditary, that his mother is not affected, and the possibility that Plaintiff's father could be spectrin deficient.

A February 21, 1995, report from Patricia A. Ball, M.D., on referral from J. A. Quiroz, M.D., confirmed that Plaintiff suffered from hereditary spherocytosis, but noted that "his hemoglobin was normal for his prepubertal age" and he therefore did not "feel that any treatment was necessary although folic acid might be considered since he [did] not appear to be very well nourished" (R. 144).

The medical record contains largely illegible hand-written exam notes from an unknown physician ranging from October 21, 1995, to an illegible date in 2003, which appear to examine his blood test results. (R. 121- 131).[3]

---

[1] Gallstones.

[2] "A genetic disorder of the red blood cell membrane clinically characterized by anemia, jaundice (yellowing) and splenomegaly (enlargement of the spleen). . . . . The clogging of the spleen with red cells almost invariably causes splenomegaly. The breakup of the red cells releases hemoglobin and the heme part gives rise to bilirubin, the pigment of jaundice. The excess bilirubin leads to the formation of gallstones, even in childhood. There is also often iron overload due to the excess destruction of iron-rich red cells." MedicineNet.com at http://www.medterms.com/script/main/art.asp?articlekey=3724

[3] The illegible date is likely to be February 20, 2003, which would correlate with Plaintiff's blood testing.

An October 24, 1995, abdominal ultrasound revealed Plaintiff had a probable small cholelith and splenomegaly (R. 143).

An April 9, 1996, abdominal ultrasound report indicated Plaintiff suffered from cholelithiasis and splenomegaly (R. 142).

Blood test results contained in the record, ranging from October 21, 1995 to February 20, 2003 consistently show Plaintiff suffered from low hemoglobin levels:
- October 21, 1995, hemoglobin at 13.1 (R. 159);
- April 9, 1996, hemoglobin at 11.8 (R. 157);
- April 15, 1997, hemoglobin at 13.1 (R. 154);
- October 25, 1997, hemoglobin at 12.6 (R. 151);
- May 11, 1998, hemoglobin at 12.8 (R. 150);
- November 26, 1999, hemoglobin at 12.4 (R. 147-149);
- May 6, 2000, hemoglobin at 12.4 (R. 146);
- April 13, 2001, hemoglobin at 12.5 (R. 118-119);
- June 1, 2002, hemoglobin at 11.9 (R. 116-117) and
- February 20, 2003, hemoglobin at 12.4 (R. 114-115).

A May 7, 1996, exam report by Joseph A. Balog, D.O., indicated Plaintiff should continue having his hemoglobin and spleen monitored and explained to Plaintiff and his mother that his gallbladder would be removed if a splenectomy were required in the future (R. 141).

A June 25, 1996, exam report from Robert E. Bloom, M.D., on referral from Robert M. Landsorf, D.O., in regards to Plaintiff's splenomegaly and anemia, indicated that since Plaintiff's anemia was not severe at the time and the risk of infection lessens as Plaintiff gets older it was recommended that Plaintiff wait until his anemia got worse to perform a splenectomy (R. 139-140). Laboratory results also indicated Plaintiff had a hemoglobin of 10.8 (R. 139).

An April 15, 1997, abdominal ultrasound showed Plaintiff's spleen was enlarged and noted an echogenic mass adjacent to the spleen, which could represent an accessory spleen (R. 138).

A November 4, 1997, abdominal ultrasound of Plaintiff revealed an enlarged spleen and diagnosed gallstones and splenomegaly (R. 137).

A May 19, 1998, abdominal ultrasound showed Plaintiff's spleen was mildly enlarged and his gallbladder contained "dense echogenic foci with acoustical shadowing consistent with cholelithiasis" (R. 136).

A January 5, 1999, abdominal ultrasound found Plaintiff had gallstones and splenomegaly (R. 135).

A December 28, 1999, radiology report found Plaintiff's spleen size was normal and that he suffered from cholelithiasis (R. 134).

2

On May 24, 2000, Plaintiff saw Dr. Balog due to his continued spleen enlargement and congenital spherocytosis (R. 132). The report by Dr. Balog indicated Drs. Landsdorf and Johnson's office would arrange for Plaintiff to see a hematologist for consultation on a possible splenectomy and cholecystectomy and that surgery would be scheduled pending the results of the hematologist evaluation.
]

On June 19, 2000, Plaintiff saw a physician, name unknown, to discuss a possible splenectomy to help his hereditary spherocytosis, which has been avoided in the past due to his young age (R. 120). His grandmother accompanied him and prompted most of the questions regarding the pros and cons of having the surgery. Exam notes reported that the physician discussed the procedure in detail, but that a recommendation could not be made without knowing Plaintiff's hemoglobin level. It was reported that Plaintiff "continued to be inactive and 'slow' as he has been through his whole life so far".

A July 21, 2000, abdominal ultrasound reported Plaintiff had cholelithiasis, unchanged from the December 28, 1999, exam, and a mildly enlarged spleen (R. 170).

On August 10, 2000, Plaintiff visited Dr. Alaa Owainati, on referral from Dr. Amin Badawi, for a second opinion on his hemolytic anemia (R. 276). Dr. Owainati did not recommend a splenectomy and recommended a follow-up in four months (R. 278).

On December 14, 2000, Plaintiff saw Dr. Owainati who noted that a splenectomy was not recommended since his hemoglobin was stable at the time, but may be considered in the future if it "got to maybe around 10 or lower and his is symptomatic of anemia" (R. 272). Plaintiff had no complaints, denied fatigue, bleeding and/or shortness of breath on exertion. Plaintiff reported that he was working at Kroger. Plaintiff's mother presented a letter from Plaintiff's grandmother "indicating the necessity of a splenectomy". Dr. Owainati, "because of the feeling on the family's side requesting splenectotomy" recommended that Plaintiff's mother get a second opinion at Karmonos Cancer Institute and referred her to Dr. Paul Swerdlow.

An April 25, 2001, ultrasound of Plaintiff's liver reported cholelithasis and splenomgaly (R. 169).

A June 7. 2002, ultrasound of the liver indicated Plaintiff suffered from probable hemangioma[4] involving the posterior superior aspect of the right lobe of the liver, measuring 9 millimeters in size, and splenomegaly (R. 168)

A December 29, 2002, report by Nancy A. Torgerson, M.S., a Speech and Language Pathologist, summarized Plaintiff's progress, after his initial exam on October 8, 2002, from nine treatment sessions he received between October 15, 2002 to December 17, 2002 (R. 109). Dr.

---

[4] "[A] benign (non-cancerous) tumor consisting of dilated blood vessels. When a hemangioma occurs in the liver it is called a hepatic hemangioma." Medline Plus at http://www.nlm.nih.gov/medlineplus/ency/article/000243.htm

Torgerson noted that Plaintiff showed slow, but steady progress throughout treatment. Plaintiff's range of motion increased, but "remained significantly reduced." The report also indicated Plaintiff learned three speech strategies (slower rate, segmentation and over-articulation) to improve his communication, but needed moderate cues to maintain their use in conversation.

A February 27, 2003, abdominal ultrasound indicated Plaintiff suffered from acute cholecystitis and cholelithiasis (R. 160, 167).

On March 13, 2003, Plaintiff saw Dr. Bloom and reported epigastric pain. (R. 163). Exam notes indicate that Plaintiff's hemoglobin was at 12.7 and that an ultrasound showed a gall stone, but no spleen enlargement. Dr. Bloom noted he did not feel that Plaintiff needed a splenectomy and recommended he return in a year.

On February 20, 2004, Plaintiff visited North Oakland Medical Centers for "pain in the left side of the chest aggravated by taking deep breath", left heel pain and epigastric pain which was worse after eating (R. 250). The physician found Plaintiff had a left heel spur, gastritis, myositis and spherocytosis and prescribed medications.

## APPENDIX A

### Summary of Facts Regarding Plaintiff's Physical Impairments

The medical record includes exams dating as far back as November 22, 1980, for a fever Plaintiff had at seven months old. (R. 177).   These reports include largely illegible hand-written doctors reports from November 22, 1980, to February 12, 1985, for doctor's appointments for fever, vaccinations and foot x-rays that do not appear relevant to the Plaintiff's current disability claims (R. 177-189).

A February 28, 1992, blood test report showed Plaintiff's hemoglobin level at 12.3, with a normal hemoglobin range between approximately 13 - 18. (R. 192).

A March 18, 1992, echogram of the abdomen found Plaintiff suffered from cholelithiasis[1] without biliary dilatation and a slightly enlarged spleen. (R. 194).

A July 13, 1993, letter from Professor Robert M. Johnson at Wayne State University School of Medicine confirms Plaintiff's diagnosis of hereditary spherocytosis,[2] after conducting rheological examinations on both Plaintiff and his mother (R. 145). Notes indicated that the condition is hereditary, that his mother is not affected, and the possibility that Plaintiff's father could be spectrin deficient.

A February 21, 1995, report from Patricia A. Ball, M.D., on referral from J. A. Quiroz, M.D., confirmed that Plaintiff suffered from hereditary spherocytosis, but noted that "his hemoglobin was normal for his prepubertal age" and he therefore did not "feel that any treatment was necessary although folic acid might be considered since he [did] not appear to be very well nourished" (R. 144).

The medical record contains largely illegible hand-written exam notes from an unknown physician ranging from October 21, 1995, to an illegible date in 2003, which appear to examine his blood test results. (R. 121- 131).[3]

---

[1]Gallstones.

[2]"A genetic disorder of the red blood cell membrane clinically characterized by anemia, jaundice (yellowing) and splenomegaly (enlargement of the spleen). . . . . The clogging of the spleen with red cells almost invariably causes splenomegaly. The breakup of the red cells releases hemoglobin and the heme part gives rise to bilirubin, the pigment of jaundice. The excess bilirubin leads to the formation of gallstones, even in childhood. There is also often iron overload due to the excess destruction of iron-rich red cells." MedicineNet.com at http://www.medterms.com/script/main/art.asp?articlekey=3724

[3]The illegible date is likely to be February 20, 2003, which would correlate with Plaintiff's blood testing.

1

An October 24, 1995, abdominal ultrasound revealed Plaintiff had a probable small cholelith and splenomegaly (R. 143).

An April 9, 1996, abdominal ultrasound report indicated Plaintiff suffered from cholelithiasis and splenomegaly (R. 142).

Blood test results contained in the record, ranging from October 21, 1995 to February 20, 2003 consistently show Plaintiff suffered from low hemoglobin levels:
- October 21, 1995, hemoglobin at 13.1 (R. 159);
- April 9, 1996, hemoglobin at 11.8 (R. 157);
- April 15, 1997, hemoglobin at 13.1 (R. 154);
- October 25, 1997, hemoglobin at 12.6 (R. 151);
- May 11, 1998, hemoglobin at 12.8 (R. 150);
- November 26, 1999, hemoglobin at 12.4 (R. 147-149);
- May 6, 2000, hemoglobin at 12.4 (R. 146);
- April 13, 2001, hemoglobin at 12.5 (R. 118-119);
- June 1, 2002, hemoglobin at 11.9 (R. 116-117) and
- February 20, 2003, hemoglobin at 12.4 (R. 114-115).

A May 7, 1996, exam report by Joseph A. Balog, D.O., indicated Plaintiff should continue having his hemoglobin and spleen monitored and explained to Plaintiff and his mother that his gallbladder would be removed if a splenectomy were required in the future (R. 141).

A June 25, 1996, exam report from Robert E. Bloom, M.D., on referral from Robert M. Landsorf, D.O., in regards to Plaintiff's splenomegaly and anemia, indicated that since Plaintiff's anemia was not severe at the time and the risk of infection lessens as Plaintiff gets older it was recommended that Plaintiff wait until his anemia got worse to perform a splenectomy (R. 139-140). Laboratory results also indicated Plaintiff had a hemoglobin of 10.8 (R. 139).

An April 15, 1997, abdominal ultrasound showed Plaintiff's spleen was enlarged and noted an echogenic mass adjacent to the spleen, which could represent an accessory spleen (R. 138).

A November 4, 1997, abdominal ultrasound of Plaintiff revealed an enlarged spleen and diagnosed gallstones and splenomegaly (R. 137).

A May 19, 1998, abdominal ultrasound showed Plaintiff's spleen was mildly enlarged and his gallbladder contained "dense echogenic foci with acoustical shadowing consistent with cholelithiasis" (R. 136).

A January 5, 1999, abdominal ultrasound found Plaintiff had gallstones and splenomegaly (R. 135).

A December 28, 1999, radiology report found Plaintiff's spleen size was normal and that he suffered from cholelithiasis (R. 134).

2

On May 24, 2000, Plaintiff saw Dr. Balog due to his continued spleen enlargement and congential spherocytosis (R. 132). The report by Dr. Balog indicated Drs. Landsdorf and Johnson's office would arrange for Plaintiff to see a hematologist for consultation on a possible splenectomy and cholecystectomy and that surgery would be scheduled pending the results of the hematologist evaluation.
]

On June 19, 2000, Plaintiff saw a physician, name unknown, to discuss a possible splenectomy to help his hereditary spherocytosis, which has been avoided in the past due to his young age (R. 120). His grandmother accompanied him and prompted most of the questions regarding the pros and cons of having the surgery. Exam notes reported that the physician discussed the procedure in detail, but that a recommendation could not be made without knowing Plaintiff's hemoglobin level. It was reported that Plaintiff "continued to be inactive and 'slow' as he has been through his whole life so far".

A July 21, 2000, abdominal ultrasound reported Plaintiff had cholelithiasis, unchanged from the December 28, 1999, exam, and a mildly enlarged spleen (R. 170).

On August 10, 2000, Plaintiff visited Dr. Alaa Owainati, on referral from Dr. Amin Badawi, for a second opinion on his hemolytic anemia (R. 276). Dr. Owainati did not recommend a splenectomy and recommended a follow-up in four months (R. 278).

On December 14, 2000, Plaintiff saw Dr. Owainati who noted that a splenectomy was not recommended since his hemoglobin was stable at the time, but may be considered in the future if it "got to maybe around 10 or lower and his is symptomatic of anemia" (R. 272). Plaintiff had no complaints, denied fatigue, bleeding and/or shortness of breath on exertion. Plaintiff reported that he was working at Kroger. Plaintiff's mother presented a letter from Plaintiff's grandmother "indicating the necessity of a splenectomy". Dr. Owainati, "because of the feeling on the family's side requesting splenectotomy" recommended that Plaintiff's mother get a second opinion at Karmonos Cancer Institute and referred her to Dr. Paul Swerdlow.

An April 25, 2001, ultrasound of Plaintiff's liver reported cholelithasis and splenomgaly ®. 169).

A June 7, 2002, ultrasound of the liver indicated Plaintiff suffered from probable hemangioma[4] involving the posterior superior aspect of the right lobe of the liver, measuring 9 millimeters in size, and splenomegaly ®. 168)

A December 29, 2002, report by Nancy A. Torgerson, M.S., a Speech and Language Pathologist, summarized Plaintiff's progress, after his initial exam on October 8, 2002, from nine treatment sessions he received between October 15, 2002 to December 17, 2002 (R. 109). Dr.

---

[4]"[A] benign (non-cancerous) tumor consisting of dilated blood vessels. When a hemangioma occurs in the liver it is called a hepatic hemangioma." Medline Plus at http://www.nlm.nih.gov/medlineplus/ency/article/000243.htm

Torgerson noted that Plaintiff showed slow, but steady progress throughout treatment. Plaintiff's range of motion increased, but "remained significantly reduced." The report also indicated Plaintiff learned three speech strategies (slower rate, segmentation and over-articulation) to improve his communication, but needed moderate cues to maintain their use in conversation.

A February 27, 2003, abdominal ultrasound indicated Plaintiff suffered from acute cholecystitis and cholelithiasis (R. 160, 167).

On March 13, 2003, Plaintiff saw Dr. Bloom and reported epigastric pain. (R. 163). Exam notes indicate that Plaintiff's hemoglobin was at 12.7 and that an ultrasound showed a gall stone, but no spleen enlargement. Dr. Bloom noted he did not feel that Plaintiff needed a splenectomy and recommended he return in a year.

On February 20, 2004, Plaintiff visited North Oakland Medical Centers for "pain in the left side of the chest aggravated by taking deep breath", left heel pain and epigastric pain which was worse after eating (R. 250). The physician found Plaintiff had a left heel spur, gastritis, myositis and spherocytosis and prescribed medications.

4